**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CASSIE HOUCK, | CASE NO. 1:14-cv-02212-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | **MEMORANDUM** |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | Docs. 1, 10, 11, 12, 13, 14 |

## MEMORANDUM

### I.    Procedural Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Cassie Houck ("Plaintiff") for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.*, §§416.901 *et. seq.*[1] (the "Regulations").

On June 9, 2011, Plaintiff applied for SSI. (Tr. 150-51). On September 16, 2011, the Bureau of Disability Determination ("state agency") denied Plaintiff's application (Tr. 75-91), and Plaintiff requested a hearing. (Tr. 92-94). On April 10,

---

[1] Part 404 governs DIB, Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

2013, an ALJ held a hearing at which Plaintiff's mother, Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 28-74).  On April 18, 2013, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 12-27). Plaintiff requested review with the Appeals Council (Tr. 9-11), which the Appeals Council denied on October 21, 2014, affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On November 19, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On January 21, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On March 3, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 12). On April 3, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 13). On April 17, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 14). July 14, 2015, the parties consented to the adjudication of this case by the undersigned. (Doc. 16, 17). The matter is now ripe for review.

## II.    Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist

in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III.   Relevant Facts in the Record

Plaintiff was born in 1993 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 23); 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and no past relevant work. (Tr. 23).

Plaintiff experienced significant developmental delay and anxiety in her elementary school years. (Tr. 338-39, 342). She was initially placed in speech therapy three times per week. (Tr. 343). However, her teacher's aide for sixth through eighth grade "described significant growth and improvement…began to speak independently for herself and also began to take significant responsibility for her own school work…also started to initiate more interactions with peers and generally made very good academic progress." (Tr. 339). By high school, she was "doing very well…reported that she likes all of her teachers and feels comfortable within the school setting." (Tr. 338). She was in "no full time learning support classes." (Tr. 339). She was a "bright, enthusiastic and diligent student who reads well and pays adequate attention in the classroom." (Tr. 343). Plaintiff's speech therapy was decreased to once per week. (Tr. 343). Plaintiff "often volunteered around the house." (Tr. 344).

In September of 2008, psychologist Dr. Freeman Chakara, Psy.D, conducted a neuropsychological examination. (Tr. 348). Plaintiff exhibited an average IQ, "perhaps confirming that her abilities are largely within normal parameters," and a slight improvement over IQ testing five years earlier. (Tr. 345). Plaintiff's math skills were "borderline impaired." (Tr. 345). She exhibited "relative strengths in visual-spatial reasoning over verbal problem solving." (Tr. 346). Dr. Chakara noted that:

> [Plaintiff's] attention skills were largely intact as were learning and memory functions. Poor encoding was noted mainly in relation to increased task complexity. Language skills were mildly impaired…Most notable were deficits in executive function, involving perseveration and slow mental efficiency.

(Tr. 348). Dr. Chakara opined that Plaintiff had a GAF of 65. (Tr. 347).

In October of 2008, psychiatrist Dr. Shawna Brent, M.D., opined that Plaintiff's anxiety "may still be occasionally problematic…[but] with ongoing age, there will be less distress precipitated by this emotion." (Tr. 340). Dr. Brent opined that Plaintiff's GAF was 65, did not recommend medication, and explained that, "based on symptoms at this time which are minimal, I would not recommend outpatient therapy." (Tr. 341).

In 2009, Plaintiff was discharged from speech therapy at Carlisle Regional Medical Center. (Tr. 350). Plaintiff continued with misarticulation and a fluency disorder, and would be following up with speech treatment at home and private voice lessons. (Tr. 350).

In April of 2011, Plaintiff had a physical examination with Dr. Holly Hoffman, M.D. (Tr. 359). Plaintiff reported that she "mastered anxiety over separation and did not need any meds for trip to FL!" (Tr. 359). Plaintiff was "doing well in school" and "involved in school and/or community activities: band (flute)." (Tr. 359). She had "good relationships with family and peers." (Tr. 359). Examination indicated an articulation deficit and perseveration, but was otherwise

normal. (Tr. 359). Plaintiff was "pleasant" with "normal" motor skills, behavioral development, neuro-development, and language development. (Tr. 360). Plaintiff was prescribed naproxen for menstrual cramps and a prescription to treat acne. (Tr. 360). She was instructed to follow-up for another examination in one year. (Tr. 360).

On May 23, 2011, Plaintiff's individualized educational placement ("IEP") team determined that Plaintiff could "participate in the regular education setting" for the 2011-2012 school year, her senior year of high school. (Tr. 222). She would continue to have access to a "resource room for all assessments and assignments" and thirty minutes of speech therapy per week. (Tr. 222). Plaintiff was recommended for "itinerant" special education supports, defined as "20% or less of the school day." (Tr. 223).[2] The IEP team determined that Plaintiff would not need an extended school year. (Tr. 217, 222). They explained that Plaintiff was "able to recoup the information taught from year to year." (Tr. 251). Plaintiff was expected to graduate after meeting "standard district requirements and credits." (Tr. 207, 237). Her requirements would not "be adapted" and she would not be graduating

---

[2] In contrast, the prior school year, Plaintiff had been required to take two classes in a special education setting and two classes in the regular education setting. (Tr. 252). At that time, her "difficulty with speech and language related skills ma[de] it difficult for her to function in the regular education setting without additional support." (Tr. 252). That year, she received "supplemental" special education, defined as "more than 20% of the day but less than 80% of the day." (Tr. 254).

"based on completion of IEP goals and objectives." (Tr. 207, 237). She "participate[d] in the general education curriculum for all subjects." (Tr. 205).

The IEP team explained that Plaintiff did not "exhibit behaviors that impede[d]" her learning or that of others. (Tr. 201). Plaintiff had "met [her] goal" for speech and language, maintaining "a rate of fluency in the classroom at 99% fluent" and her "intelligibility [was] judged to be at 100 accuracy." (Tr. 203). She would receive continued speech therapy for articulation and self-monitoring. (Tr. 205). Teachers reported Plaintiff "always has her written homework prepared and ready for class" and exhibited a "wonderful attitude about her work." (Tr. 203). She needed extra time for tests, but was "learning to communicate in French-a pretty big accomplishment." (Tr. 203). She did "better with written directions." (Tr. 203). Her French teacher reported that she was "coming 'into her own'" and had "traveled leap years in overcoming shyness." (Tr. 204). Plaintiff "was able to continue doing well in class even when involved in activities such as the school musical and band performances." (Tr. 204). Plaintiff struggled with "step-by-step" instructions, read directions as "black and white," had problems with basic computations, struggled to develop ideas thoroughly in writing, and tended to lose patience with her teachers. (Tr. 204). The IEP team wrote that Plaintiff "reports that she is interested in political science and plans to attend a 4 year college in a degree program. The team agrees that participating in a college program is an

appropriate goal for [Plaintiff]." (Tr. 205). When asked to explain Plaintiff's work capacity, the IEP indicated that:

> [Plaintiff's] teachers all consistently note a strong work ethic and a desire to please adults. She routinely completes homework and participates in class. Her reading and math skills, while relatively weak in some specific areas, are functional for success in the work place…[Plaintiff] needs to continue to develop her writing skills when asked to complete an essay or other non fiction writing assignment.

(Tr. 205).

The relevant period begins a month later, when Plaintiff applied for SSI. (Tr. 150-51). In July of 2011, Plaintiff's mother completed a Function Report. (Tr. 271). She reported that Plaintiff hands changes in routine "ok," and does not handle stress "very well." (Tr. 270). She reported that Plaintiff will "stutter or cry when nervous." (Tr. 270). She reported that Plaintiff can complete tasks and follows specific written instructions "great," but struggles with spoken instructions. (Tr. 269). She indicated that Plaintiff did not have "any problems getting along with family, friends, neighbors, or others." (Tr. 269). She reported that Plaintiff "is able to work at certain jobs." (Tr. 264).

Plaintiff also completed a Function Report. (Tr. 262). She reported that she could handle changes in routine well, and handled stress "with anxiety." (Tr. 262). She reported that she had no problem getting along with others, and got along with authority figures "very well." (Tr. 261-62). She reported that she can finish tasks and follow instructions. (Tr. 261). She reported a variety of hobbies, interests, and

social activities. (Tr. 260). She also reported that "there are jobs [she] can do," as long as they do not have "a lot of math" or stress. (Tr. 256).

On July 25, 2011, state agency psychologist Dr. Alex Siegel, Ph.D., opined that a psychiatric consultative examination would be necessary because most of the medical records for psychological treatment were from 2008 or earlier. (Tr. 80).

On September 12, 2011, Plaintiff underwent a consultative examination with state agency psychologist Dr. Christopher Royer, Psy.D. (Tr. 372). Plaintiff reported that she was "in her ninth year in band, and her first year of marching bands…she has a lot of friends and she has new classes and she is learning a lot." (Tr. 372). Plaintiff reported that she had "worked a little bit in her mother's shop" and "has taught some flute lessons to younger kids." (Tr. 374). Plaintiff's mother was present, and reported a history of speech and motor problems. (Tr. 373). Dr. Royer reviewed neuropsychological excerpts "from 2008." (Tr. 374). He noted that they indicated "fairly normal academic achievement skills." (Tr. 374). Examination indicated a speech impediment, some stuttering, a reduced pace of speech, difficulty comprehending multi-step questions, "clear and concrete" thought process, and "borderline to fair" judgment. (Tr. 374). "No perceptual disturbances or other gross psychopathology were reported or observed." (Tr. 374). Plaintiff's recall and attention was intact, she made an arithmetic error and no errors on a test of serial 3 addition, had normal reasoning by analogy, was

"generally able to engage in abstract conceptualization," had adequate fund of knowledge, and exhibited anxiety. (Tr. 375). Dr. Royer opined that Plaintiff had a GAF of 50 and marked limitation in interacting with the public or coworkers, responding to work pressures, and responding to changes in the work setting. (Tr. 378).

On September 15, 2011, Dr. Siegel reviewed Plaintiff's file, including Dr. Royer's opinion, and authored a medical opinion. (Tr. 84). Dr. Siegel explained that Dr. Royer's opinion contained "internal inconsistencies and inconsistencies with other [medical records]." (Tr. 84). Dr. Siegel opined that:

> The claimant can understand, retain, and follow simple job instructions, i.e. perform one and two step tasks. The claimant is able to meet the basic mental demands of simple work on a sustained basis despite the limitations resulting from her impairments. Claimant is capable of doing routine work not requiring close interactions with others.

(Tr. 84). Dr. Siegel opined that Plaintiff was no more than moderately limited in interacting with others because "Claimant has some speech difficulties but is 90% intelligible. Claimant reports she has friends. She is in the marching band at school. She has been in band for 9 years. The claimant is able to maintain socially appropriate behavior." (Tr. 83). Dr. Siegel opined that Plaintiff was no more than moderately limited in handling the work setting because "the medical evidence reveals that the claimant retains the abilities to manage the mental demands of many types of jobs not requiring complicated tasks." (Tr. 84). Dr. Siegel opined

that Plaintiff had mild restriction of activities of daily living and moderate difficulties maintaining social functioning and concentration, persistence, or pace. (Tr. 80).

On September 15, 2011, Shawna Chamberlin completed a Teacher Questionnaire. (Tr. 283). She indicated that she had seen Plaintiff weekly since 2008, and daily when they had English. (Tr. 276). She indicated that there was no "unusual degree of absenteeism." (Tr. 276). She indicated that Plaintiff would lose patience with teachers, struggled with multi-step problems, had problems relating to others, and needed a longer time than others to complete tasks. (Tr. 277-81). However, she opined that Plaintiff had some slight and obvious problems, but no serious problems or very serious problems. (Tr. 277-81).

In January of 2012, Plaintiff's IEP team completed a reevaluation. (Tr. 407-41). Plaintiff's mother reported that Plaintiff got along well with her family, but tends to "cling to" them. (Tr. 408). She reported that Plaintiff "attends school on a regular basis and…is motivated for school." (Tr. 409). Plaintiff's mother reported that Plaintiff "needs math support, help understanding concepts, and extra time…educational aspirations include graduating for college." (Tr. 409). Plaintiff's government teacher indicated that Plaintiff was "a strong critical thinker...understands the material and can think critically of our government because of her interest in political science." (Tr. 421). Plaintiff's geometry teacher

indicated that Plaintiff was "a very concrete thinker" and will argue with teachers. (Tr. 421). However, "now [Plaintiff] is willing to fix the mistakes." (Tr. 421). She was "better able to understand what is asked of her than she has in the past." (Tr. 421). Plaintiff continued to exhibit below average speech. (Tr. 422).

Plaintiff underwent additional testing as part of the reevaluation. (Tr. 424). She "appeared to have no problem with paying attention or focusing during the testing sessions." (Tr. 424). Plaintiff had "articulation difficulties." (Tr. 424). Plaintiff's general cognitive abilities were in the low average range, her working memory was borderline, and her processing speed was low average. (Tr. 425-46). Plaintiff's overall math abilities were average. (Tr. 427). Plaintiff's mother rated Plaintiff has significantly more anxious than her teachers. (Tr. 429). Plaintiff was recommended to work with a guidance counselor to complete college applications and to contact the office of disabilities at college once accepted. (Tr. 432). Providers explained that Plaintiff's verbal ability was lower "primarily in the younger grades, but…as she has further developed her speech and language abilities her verbal scores have been found to mirror her nonverbal abilities and have been found to be in the average range." (Tr. 432). Providers opined that:

> [Plaintiff] no longer meets the criteria to be identified as a student with a specific learning disability as she does not show a significant discrepancy between her cognitive ability and achievement, and her academic functioning is found to be in the Average range and not significantly below age and grade level standards. However, [Plaintiff] does meet the criteria to be identified as a student with

Other Health impairment, as her previous diagnoses of ADHD and Amnesitic Disorder due to her infantile anoxia have caused her to have "limited alertness with respect to the education environment" and appear to be impacting her educational performance in the form of her displaying working memory difficulties 9i.e. needing multiple repetitions of information) as found on her most recent cognitive assessment and as reported by [Plaintiff's] teachers. [Plaintiff] also continues to meet the criteria to be identified as student with a Speech and Language Disability, and her difficulties related to expressive language continue to appear to be related to this disability. [Plaintiff] should continue to receive special education services that are designed to address her specific areas of need.

(Tr. 433).

On April 10, 2012, Plaintiff "was determined eligible for employment services from the Office of Vocational Rehabilitation ["OVR"]…In order to be eligible for services, and individual must meet the criteria of Most Significantly Disabled." (Tr. 450). Plaintiff's "eligibility determination was based on a review of records provided by Big Spring School District, Psychiatric Associates of Central PA and Carlisle Pediatric Associates." (Tr. 450).

On April 23, 2012, Plaintiff had a physical examination with Dr. Holly Hoffman, M.D. (Tr. 443). Plaintiff's only concerns were acne. (Tr. 443). Plaintiff was "doing well in school…honor roll," was "involved in school and/or community activities, percussion ensemble, voice lessons, youth group," and had "good relationships with family and peers." (Tr. 443). Examination indicated "apraxia as always," but was otherwise normal. (Tr. 443-44).

In May of 2012, Plaintiff signed up for classes at Harrisburg Area Community College ("HACC") with a major in social sciences. (Tr. 449). Notes from HACC indicate that "OVR requires her to be full-time." (Tr. 449). Plaintiff reported that her goal was to transfer to a four-year college. (Tr. 449).

On May 25, 2012, Plaintiff's school district completed a Summary of Academic Achievement and Functional Performance.[3] (Tr. 286). Plaintiff's postsecondary goals were listed as "postsecondary training in the area of political science." (Tr. 287). Plaintiff was instructed to continue to work toward "a career or secondary training after high school." (Tr. 286).

Plaintiff took five classes for twelve credit hours at HACC in the fall of 2012. (Tr. 445). She received accommodations, including a calculator, computer or adaptive aid use, extended time, and an oral proctor or oral test. (Tr. 446). She earned a 3.76 G.P.A. (Tr. 445). She took five courses for thirteen hours of credit for the Spring 2013 semester. (Tr. 445).

On April 4, 2013, Carol Zook, a Vocational Rehabilitation Counselor, wrote that she "believe[d]" Plaintiff would "need the support of a job coach to obtain and maintain any job." (Tr. 451). She wrote that this opinion was "[b]ased on the medical evidence, as well as [her] interactions with [Plaintiff]." (Tr. 451). She also opined that "if [Plaintiff] decides that she would like a job, she would benefit from

---

[3] The report explained that it was intended to "assist [Plaintiff] in planning for the future" now that she had graduated. (Tr. 286).

Community Based Work Assessments (CBWAs). OVR requires CBWAs when we are unsure of an individual's capabilities." (Tr. 450). Ms. Zook explained that Plaintiff's goals of being "President of the United States, or a politician, or possibly a lawyer" were "unrealistic." (Tr. 450). She noted that this opinion was "based on medical evidence." (Tr. 450). She explained that Plaintiff's decision "to attend HACC, with the intent to transfer to a 4-year college...was not one that OVR could support, we were unable to collaborate on an appropriate job goal or the services needed to reach that goal." (Tr. 450). She attributed Plaintiff's "academic success in high school" to her receipt of "numerous program modifications and specially designed instruction services." (Tr. 450).

On April 10, 2013, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 28). She testified that math was her worst subject, but she could add and subtract. (Tr. 36). She testified that she performed personal care, had taught flute lessons, helped her mother and store, and used public transportation. (Tr. 37). She testified that she "mostly" got along with others, including her peers at high school and college. (Tr. 39). She testified that she receives extra time to complete tests, but does not need someone to explain the questions to her. (Tr. 41). She testified that she was not yet able to drive, not able to cook on her own, and needed her mother to help her learn how to take the bus to school. (Tr. 41-45). She testified that she did not need assistance learning how to navigate buildings for her second

semester of college. (Tr. 48). She reported that two out of her five college classes were remedial, development courses. (Tr. 51). She reported that she was not receiving speech therapy at HACC. (Tr. 51).

Plaintiff's mother also appeared and testified. (Tr. 52). She testified that Plaintiff continued to need supervision to travel to unfamiliar places and would get confused while driving. (Tr. 59). She testified that Plaintiff had unsuccessfully attempted to complete simple meals and needed supervision at home and at her mother's salon. (Tr. 61-63). She testified that she continued to receive help from family members and learning disability services at HACC. (Tr. 63-66). She testified that Plaintiff does not accurately assess her own abilities. (Tr. 66-67).

On April 18, 2013, the ALJ issued the decision denying benefits. (Tr. 24). The findings relevant to this appeal are discussed in detail below.

## IV.    Plaintiff Allegations of Error

### A.    RFC

Plaintiff asserts that the ALJ erred in evaluating various pieces of evidence to conclude that she had the RFC to perform simple, low-stress work. (Pl. Brief); (Pl. Reply). Different types of evidence require different levels of evaluation. *Durden v. Colvin*, No. 115CV00118SHRGBC, 2016 WL 836627, at *19 (M.D. Pa. Jan. 25, 2016) *report and recommendation adopted*, No. 1:15-CV-0118, 2016 WL 827078 (M.D. Pa. Mar. 3, 2016).  Whether the ALJ properly evaluated a particular

piece of evidence depends on a number of factors, including its substance; its source; and whether it is medical, non-medical, or medical opinion evidence.

The ALJ must consider all of the evidence. *See* 20 C.F.R. §404.1512. However, "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." SSR 06-3p. *See also Phillips v. Barnhart*, 91 Fed.Appx. 775, 780 (3d Cir. 2004) ("the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it") *quoting Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998). Thus, the ALJ does not need to cite evidence in the decision if the ALJ is only required to consider it. *Id.*; *see also Hur v. Comm'r Soc Sec.*, 94 F. App'x130, 133(3d Cir. 2004) ("There is no requirement that the ALJ discuss in its *opinion* every tidbit of evidence included in the record").

The Third Circuit and SSR 06-3p provide that third-party statements must be explicitly addressed. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir.2000) ("we expect the ALJ to address the testimony of such additional witnesses"); SSR 06-3P. The Regulations provide that an ALJ explicitly weigh a third-party statement that meets the definition of "medical opinion." 20 C.F.R. §404.1527(a)-(d). The ALJ must provide "good reasons" for the weight assigned to a medical opinion from an individual who meets the definition of "treating source." 20 C.F.R. §404.1527(c)(2). The Regulations and Third Circuit case law require

that a medical opinion from an individual who meets the definition of a "treating source" be afforded special deference ("treating source medical opinion"). 20 C.F.R. §404.1527(c)(2); *see also Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (internal citations omitted). The Regulations and Third Circuit case law prohibit an ALJ from rejecting a treating source if the only contradictory evidence is medical, not non-medical or medical opinion. *Id.* The ALJ must make an explicit credibility finding on Plaintiff's credibility and afford Plaintiff's statements either serious consideration or great weight and. *See Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

## 1.    Medical Opinions

Plaintiff asserts that the ALJ erred in evaluating the medical opinions. Plaintiff correctly notes that the ALJ must "evaluate and explain [the] weight" given to each medical opinion. (Pl. Brief at 11). Plaintiff asserts that the ALJ erred in assigning less weight to the opinion of Dr. Royer than to the opinions of Dr. Chakara, Dr. Brent, and Dr. Siegel. (Pl. Brief at 11-16).

With regard to Dr. Siegel, Plaintiff writes that he "gave an opinion on July 25, 2011," so he was unable to review Dr. Royer's consultative examination. (Pl. Brief at 13-14). However, on July 25, 2011, Dr. Siegel simply opined that a consultative examination would be necessary. (Tr. 80). On September 15, 2011,

Dr. Siegel reviewed Plaintiff's file, including Dr. Royer's opinion, and authored a medical opinion. (Tr. 84).

Otherwise, Plaintiff notes only Dr. Royer's examining relationship. (13-14). However, the examining relationship is only one of many factors in assigning weight to non-treating medical opinions. *See* 20 C.F.R. §404.1527(c). Identifying one factor that weighs in Dr. Royer's favor does not demonstrate that the ALJ lacked substantial evidence given the other factors to resolve the conflict in favor of Dr. Siegel. *See id.*

The other factors support resolving the conflict in favor of Dr. Siegel. Plaintiff asserts that Dr. Brent and Dr. Chackara observed difficulties that support Dr. Royer's opinion. (Pl. Brief at 12-13). However, Dr. Brent and Dr. Chackara assessed Plaintiff to have a GAF of 65.[4] (Tr. 347).  Consequently, the opinions of

---

[4] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 1 to 10 denotes a persistent danger of severely hurting oneself or persistent inability to maintain minimal personal hygiene or serious suicidal act

Drs. Brent and Chackara support the ALJ's decision. Plaintiff also notes that they were issued in 2008, but they are corroborated by Dr. Siegel's opinion. (Pl. Brief at 12-13). Plaintiff cites Dr. Royer's examination observations, but the ALJ was entitled to rely on Dr. Siegel, who reviewed Dr. Royer's opinion, and opined that his examination findings were "internally inconsistent" with his opinion. (Tr. 84). *See Seever v. Barnhart*, 188 F. App'x 747, 754 (10th Cir. 2006) (We will not fault the ALJ for failing to interpret [Plaintiff's] symptoms and test results differently than [a medical expert]")(citing *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996)).

Plaintiff asserts that Ms. Chamberlin's statement and Plaintiff's mother's testimony support Dr. Royer's opinion. (Pl. Brief at 12-13). However, the question is not whether substantial evidence supports Plaintiff's proposed resolution of the

---

with clear expectation of death. . . A GAF score of 11 to 20 represents some danger of hurting self or others or occasionally fails to maintain minimal personal hygiene or gross impairment in communication. A GAF score of 21–30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood... A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning... A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships") (citing *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994).

conflict between medical opinions. The question is simply whether substantial evidence supports the ALJ's resolution of the conflicts. Substantial evidence is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Moreover, as discussed below, the ALJ properly rejected Plaintiff's mother's claims and Ms. Zook's.

None of these medical opinions were treating source medical opinions. *Infra.* Dr. Royer's is not "able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s)." 20 C.F.R. §404.1527(c)(2). Consequently, they were not entitled to special deference. *See* 20 C.F.R. §404.5127(c)(2). The ALJ complied with the requirement to explain the weight assigned to each. *Supra.* The ALJ explicitly resolved the conflict between the opinions. *Supra.* Plaintiff has failed to demonstrate that no reasonable person, applying the factors in 20 C.F.R. §404.1527(c), would have resolved the conflict against Dr. Schneider. *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal quotation omitted). The Court would refuse to direct a verdict in Plaintiff's favor if this was a jury trial. *Id.* Substantial evidence supports the ALJ's assignment of weight to the medical opinions. *Id.*

## 2.    Plaintiff's Credibility

Plaintiff asserts that "when she alleges impairments and limitations supported by medical evidence the Administrative Law Judge may not simply deny the allegations as not credible." (Pl. Brief at 16). When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P. The Third Circuit explained in *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993):

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green*, 749 F.2d at 1071. Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contrary medical evidence. *Carter*, 834 F.2d at 65; *Ferguson*, 765 F.2d at 37.

*Id.* at 1067-68.

Here, objective medical evidence supported Plaintiff's underlying impairments. *Supra.* However, the ALJ properly relied on Dr. Siegel's opinion to conclude that objective medical evidence did not support the degree of Plaintiff's allegedly disabling limitations. *See Seever v. Barnhart*, 188 F. App'x 747, 754 (10th Cir. 2006) (We will not fault the ALJ for failing to interpret [Plaintiff's] symptoms and test results differently than [a medical expert]")(citing *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir.1996)). Consequently, her claims were entitled to serious consideration, but not great weight.

Plaintiff asserts that the ALJ erred in assessing her credibility. (Pl. Brief at 16-17). Plaintiff asserts that her claims were supported by her mother's testimony, Ms. Zook's letter, and Dr. Chackara's opinion. (Pl. Brief at 16-17) (citing Tr. 38-68, 346, 451). Plaintiff asserts that her reports "should be viewed much differently in light of her mother's testimony that the Plaintiff thinks she can do anything and does not have an accurate assessment of her limitations." (Pl. Brief at 4). However, Plaintiff's assessment of her limitations is supported by her teacher, who opined that she had no serious or very serious limitations, the medical opinions of Dr. Brent, Dr. Chackara, and Dr. Siegel, and the opinion of her IEP team that pursuing a four-year degree in political science or a full-time career was an "appropriate goal." (Tr. 205). As discussed below, the ALJ properly discounted Plaintiff's mother's testimony and Ms. Zook's letter. *Infra.* As discussed above, Dr.

Chackara's opinion supports the ALJ's denial because it indicated a GAF of 65. *Supra.*

Moreover, some of Plaintiff's claims supported the ALJ. In her Function Report, she also noted that "there are jobs [she] can do," as long as they do not have "a lot of math" or stress. (Tr. 256). The ALJ properly assessed Plaintiff's credibility. *See* SSR 96-7p. Plaintiff's ability to participate in full-time college courses, with only two out of five as remedial courses, her ability to navigate her second semester courses without assistance, her conservative course of treatment, and objective evidence, as interpreted by Dr. Siegel, provide substantial evidence to the ALJ's credibility decision. *See* SSR 96-7p. Plaintiff has failed to demonstrate that no reasonable person would have found that she was less than fully credible. *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal quotation omitted). The Court would refuse to direct a verdict in Plaintiff's favor if this was a jury trial. *Id.* Substantial evidence supports the ALJ's assignment of weight to the medical opinions. *Id.*

### 3.    Third-Party Statements

Plaintiff asserts that the ALJ erred in evaluating Plaintiff's mother's testimony and Ms. Zook's statement. (Pl. Brief at 3). Plaintiff asserts that the ALJ "made no finding on the credibility of the Plaintiff's mother, Lori Houck." (Pl. Brief at 3).

Unlike Plaintiff's claims, which must be at least seriously considered, the ALJ merely needs to explicitly acknowledge third-party statements from Ms. Houck and Ms. Zook. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir.2000) ("we expect the ALJ to address the testimony of such additional witnesses"); SSR 06-3P. The ALJ made a credibility finding regarding Plaintiff's mother, writing that "[r]egarding the credibility of the claimant's allegations and the allegations made on behalf of the claimant, the undersigned finds that the claimant's robust activities of daily living do not support a finding of disability." (Tr. 22). Moreover, some of Ms. Houck's claims supported the denial. She reported in her Function Report that Plaintiff "is able to work at certain jobs." (Tr. 264). Consequently, her testimony was inconsistent with her function report. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P. Plaintiff's teacher, Ms. Chamberlin, authored a statement that contradicts Ms. Houck's claims, as she opined that Plaintiff had no serious or very serious limitations. (Tr. 276-83). Moreover, as discussed below, Ms. Houck's statement is contradicted by the IEP's most recent evaluations of Plaintiff. *Infra.*

With regard to Ms. Zook, Plaintiff asserts that the ALJ assigned limited weight to her opinion "not because she was not an acceptable medical source…but simply because the Plaintiff and the Office of the Vocational Rehabilitation were

not able to 'collaborate…'" (Pl. Brief at 15). However, there is no requirement that the ALJ provide a particular reason for rejecting her letter. *See* SSR 06-3p. The ALJ explicitly addressed her statement and explained the weight given. That is all the Regulations require.

Plaintiff further asserts that Plaintiff's "need for a job coach is not a medical opinion beyond the scope of her training but a vocational opinion which she is trained to address." (Pl. Brief at 15-16). However, determining Plaintiff's "needs," in other words her residual functional capacity, is a medical question. If Ms. Zook had testified as a VE at the ALJ hearing, she would not have been allowed to testify as to whether Plaintiff needed a limitation related to a job coach in the RFC. She would only have been allowed to testify as to the presence of jobs in the economy given the need for a job coach. *See* SSR 00-4p.

Similarly, Ms. Zook's letter noted that Plaintiff had been deemed eligible for services, which correlated to an OVR finding of "Most Significantly Disabled" (Tr. 450). However, OVR's findings do not govern SSA's determinations, and the Regulations are clear that:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

20 C.F.R. § 416.904; *see Hill v. Astrue*, No. 08-151, 2009 WL 2883039, at *8 (W.D. Pa. Sept. 4, 2009) ("the OVR's standard of disability does not mirror that of the Act, and therefore a finding of disability by that agency does not mandate the same finding under the Act"); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 801, 806, 119 S. Ct. 1597, 1603, 143 L. Ed. 2d 966 (1999) ("The Social Security Act and the ADA both help individuals with disabilities, but in different ways...a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' [is an]… apparent contradiction" with being able to "perform the essential functions" of a job "with reasonable accommodation").

Finally, the Court notes that Ms. Zook reviewed the medical evidence and evidence from Plaintiff's school. (Tr. 450-51). Ms. Zook is plainly not qualified to interpret medical evidence. (Tr. 450-51). Moreover, the information from her school directly contradicted Ms. Zook's statement. Ms. Zook opined that Plaintiff was not setting appropriate goals, and would not be able to graduate with a political science degree (Tr. 450-51). Records from Plaintiff's school, however, show that Plaintiff's "educational aspirations include graduating for college." (Tr. 409). Plaintiff's government teacher indicated that Plaintiff was "a strong critical thinker...understands the material and can think critically of our government because of her interest in political science." (Tr. 421). Plaintiff was recommended to work with a guidance counselor to complete college applications and to contact

the office of disabilities at college once accepted. (Tr. 432). The IEP team wrote that Plaintiff "reports that she is interested in political science and plans to attend a 4 year college in a degree program. The team agrees that participating in a college program is an appropriate goal for [Plaintiff]." (Tr. 205). When asked to explain Plaintiff's work capacity, the IEP indicated that:

> [Plaintiff's] teachers all consistently note a strong work ethic and a desire to please adults. She routinely completes homework and participates in class. Her reading and math skills, while relatively weak in some specific areas, are functional for success in the work place…[Plaintiff] needs to continue to develop her writing skills when asked to complete an essay or other non fiction writing assignment.

(Tr. 205).

Plaintiff has failed to demonstrate that no reasonable person would have assigned little weight to claims from her mother and Ms. Zook. *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal quotation omitted). The Court would refuse to direct a verdict in Plaintiff's favor if this was a jury trial. *Id.* Substantial evidence supports the ALJ's assignment of weight to the medical opinions. *Id.*

## V.    Conclusion

Ms. Zook's statement, Dr. Royer's opinion, some of Plaintiff's claims, and some of Plaintiff's mother's claims supported her allegation of disability. *Supra.* However, the ALJ properly assigned little weight to Ms. Zook's statement and Dr. Royer's opinion. *Supra.* Some of Plaintiff's claims and some of Plaintiff's

mother's claims supported the denial of benefits. *Supra*. Dr. Siegel's opinion, Ms. Chamberlin's statement, Plaintiff's senior year IEPs, and her course of treatment also support the denial of benefits. *Supra*.

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Here, a reasonable mind might have denied Plaintiff benefits. The Court would refuse to direct a verdict in Plaintiff's favor if this was a jury trial. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: March 31, 2016          _____s/Gerald B. Cohn_____
                                GERALD B. COHN
                                UNITED STATES MAGISTRATE JUDGE